IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

ELIZABETH PALMER,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )     CIVIL ACTION NO. 3:04cv304-C
                                     )              (WO)
JO ANNE B. BARNHART,                 )
COMMISSIONER OF SOCIAL               )
SECURITY,                            )
                                     )
          Defendant.                 )

## MEMORANDUM OPINION

### I.  Introduction

The plaintiff, Elizabeth Palmer ("Palmer"), applied for disability insurance benefits

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, alleging that she was

unable to work because of a disability.   Her application was denied at the initial

administrative level.  Palmer then requested and received a hearing before an Administrative

Law Judge ("ALJ").  Following the hearing, the ALJ also denied the claim.  The Appeals

Council rejected a subsequent request for review.  The ALJ's decision consequently became

the final decision of the Commissioner of Social Security ("Commissioner").[1]  *See Chester*

*v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for review

pursuant to 42 U.S.C. §§ 405 (g) and 1631(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and

_____

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded for further proceedings.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the person unable to perform his or her former occupation?
> (5)  Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

2

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  Procedural History

### A.  Introduction

Palmer was 52 years old at the time of the hearing before the ALJ.  (R. 570).  She has a high school equivalency diploma and an associate degree in Business from Atlanta

---

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

Metropolitan College.  (R. 493).  Palmer's prior experience includes work as a wire stamping

machine operator, cemetery lot salesperson, and housekeeper.  (R. 20, 571, 574).

Palmer alleges that she became disabled due to post-traumatic stress disorder and

depression.  (R. 55-A).  She also alleges that she suffers from hypertension and occasional

shoulder and back pain. (R. 68, 575).  Following the hearing, the ALJ concluded that Palmer

has severe impairments of alcohol and cocaine dependency, substance-induced mood

disorder, post-traumatic stress disorder, and occasional mild to moderate pain.  (R. 26).  He

also concluded that Palmer has non-severe impairments of hypertension and hepatitis-C.  (R.

22).  The ALJ determined that

> [i]f the claimant abstained from alcohol and drugs, she would have the residual
> functional capacity to perform a range of low stress light work activity with the
> following limitations: mild to moderate pain which occasionally interferes with
> concentration, persistence and pace; moderate limitations in the ability to
> understand, remember and carry out detailed instructions, maintain attention
> and concentration for extended periods, perform activities within a schedule,
> maintain regular attendance, and be punctual with customary tolerances,
> sustain and ordinary routine without special supervision, and complete a
> normal workday and workweek without interruptions from psychologically
> based symptoms and to perform at a consistent pace without an unreasonable
> number and length of rest periods;  no responsible or regular general public
> contact (must be brief and superficial), working primarily alone; and routine
> changes (no multiple or rapid changes).

(R. 27).  Accordingly, the ALJ determined that Palmer could return to her past relevant work

as a stamping machine operator, and, thus, was not disabled.  *Id*.

### B.  Plaintiff's Claims

As stated by Palmer, she presents the following issues for the Court's review:

1.   The ALJ erred when he found that substance abuse was a material factor contributing to plaintiff's disability.

2.   The ALJ's decision is not supported by substantial evidence that the plaintiff is able to perform her past relevant work as a stamping machine operator.

3.   The ALJ's finding concerning the plaintiff's residual functional capacity is not supported by substantial evidence.

4.   The ALJ erred in giving too much weight to the opinion of non-treating, non-examining psychologist "medical expert" while assigning little weight to the opinion of plaintiff's treating source.

(Doc. # 25, pp. 12, 15, 17, 18).

## IV.  Discussion

Palmer raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence.  *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987).  However, the court pretermits discussion of Palmer's specific arguments because the court concludes that the ALJ erred as a matter of law, and, thus, this case is due to be remanded for further proceedings.

### A.  Relevant Medical Treatment

In 1995, the plaintiff had a nervous breakdown after which she received some counseling.  (R. 86 & 478).  Throughout 1997, Palmer received out-patient counseling at the Atlanta Veterans Administration Medical Center for major depression.  (R. 479-84).  On September 2, 1997, her counselor noted that Palmer was feeling better.  (R. 484).

5

On March 30, 1998, Palmer reported to her counselor that she was only drinking once a week. (*Id.*) Her counselor noted that her major depression was improving. (*Id.*) However, on June 30, 1998, Palmer called her counselor to report the following:

> I'm at my wits ends.  I shot up my house.  I have bullet holes in my living room and in my bedroom.

(R. 485).  According to the counselor's notes, Palmer shot up her house after learning that her insurance company would not pay for damages to a fence from a fallen tree. (R. 485-86). Palmer "estimates she shot at least 15 times in her house."  (R. 486).

Palmer was referred to the CWT (comprehensive work therapy program) in August 1998.  Although she had difficulty reporting to work consistently, she was placed with Facilities Management on September 21, 1998.  (R. 487).  She was discharged from CWT on October 13, 1998, because she "became to (sic) ill to work."  (*Id.*)

On August 13, 1999, Palmer presented at the Atlanta V.A. asking for Antabuse to stop drinking.  (R. 488).  Although she was sent to the lab, there is no indication in the record that Palmer was ever prescribed Antabuse.  (*Id.*)  Palmer called the Mental Health Clinic on August 21, 2000, seeking hospitalization for her depression and alcohol dependence.  (*Id.*)

On September 23, 2000, Palmer was admitted to the Atlanta Veterans Administration Medical Center suffering from post-traumatic stress disorder ("PTSD") and cocaine and alcohol dependency.  (R. 127, 488).  She was depressed and suicidal.  (*Id.*).  She exhibited anxiety and agitation as well as depression.  (R. 489).  In addition, Palmer was homicidal towards the individual who introduced her to crack cocaine and her neighbor because he

6

allowed his dog to bark during the night.  (R. 495).  It was recommended that Palmer go to a substance abuse treatment program before seeking treatment for depression and anxiety.  (R. 506).  Palmer was discharged with the understanding that she would enter an inpatient substance abuse treatment program.  (R. 507-508).  She was discharged on the following medications: Trazodone[4], Maxide[5], Thiamine[6], Felodipine[7] and Zoloft.[8]  (R. 129).  Palmer did not report to the substance abuse treatment program, choosing instead to seek treatment for her PTSD.  (R. 508).

Palmer was admitted to the Montrose Hudson Valley Health Care Center on October 31, 2000 for "[a]lcohol and drug and rehabilitation treatment for PTSD."  (R. 130).  Her diagnoses upon admission were polysubstance dependence, PTSD, and Dysthymia. (R. 190).  At that time, it was noted that Palmer received psychiatric medications even when she was not being detoxified.  (R. 193).  While she was at Hudson Valley, she was screened for and accepted into the Veterans Administration's PTSD Program.  (R. 131).  Upon completion of treatment at Hudson Valley, Palmer was admitted to Brecksville Veterans Administration's Post Traumatic Stress Disorder Program.  (R. 137).  She was drug and alcohol free at the time of her admission to Brecksville.  (*Id*.)

---

[4]  Trazodone is an antidepressant used to treat major depressive episodes.

[5]  Maxide is a diuretic and used to treat water retention.

[6]  Thiamine is a vitamin used to treat vitamin deficiencies caused by long-term dieting or alcoholism.

[7]  Felodipine is used to treat hypertension.

[8]  Zoloft is an antidepressant used to treat major depressive disorder in adults.

Palmer was admitted to Brecksville on December 7, 2000. (R. 204). At the time of her admission, she "describe[d] some symptoms of depression, [but] she did not meet full criteria for post-traumatic stress disorder *during this assessment*." (R. 204) (emphasis added). At the time of her admission, Palmer was suffering from depression, using drugs and alcohol, and her GAF score was 45. (R. 231). No diagnosis of PTSD was made at that time. (*Id.*)

Psychiatrist Dr. McPeak diagnosed Palmer with polysubstance dependencies, Depressive Disorder and Antisocial Personality Disorder. (R. 204, 231). Antisocial Personality Disorder was confirmed by a "pervasive pattern of disregard for and violation of the rights of others occurring since age 9." (R. 232). Depressive mood was confirmed by psychological testing. (*Id.*). On December 19, 2000, Palmer's GAF score was 50. As a result of providing a clean urine specimen for another veteran, Palmer was removed from Brecksville on January 10, 2001. (R. 294).

Hudson Valley agreed to readmit Palmer to their facility on January 23, 2001. (*Id.*) She was admitted for stabilization of PTSD and depression. (R. 286). Palmer was identified as having PTSD and episodic depressed moods. (R. 292). During a January 23, 2001 assessment, it was determined that Palmer needed assistance with anger management, stress management, and social skills. (R. 290). Although she was clean and sober for three months,[9] her GAF score was still only 50. (R. 286-87). Notwithstanding Palmer's negative

---

[9] According to Palmer she denied using drugs or alcohol since October 30, 2000. (R. 293).

drug test results,[10] she continued to exhibit symptoms of post-traumatic stress disorder and depression.  (R. 286).  During Palmer's treatment at Hudson Valley, she underwent psychotherapy for treatment of PTSD.  (R. 247, 249, 251).  Palmer was discharged from Hudson Valley on April 16, 2001.

On June 12, 2001, Palmer was admitted to the Milwaukee Veterans Administration Hospital because she "want[s] to knock [her] uncle on the head." (R. 319).  At that time, she reported wanting to attack him and wishing him dead.  (*Id*.)  On admission, she was diagnosed with Dysthymia and alcohol and cocaine abuse.  Her GAF score was 30.  (*Id*.)  She was discharged to the Veteran Administration Domiciliary on June 16, 2001.  (R. 322).  Her GAF score was 45 on discharge. (R. 319).

On July 25, 2001, Palmer reported a conflict with her roommate.  (R. 438).  Palmer had a psychiatric consult on August 8, 2001.  She had diagnoses of dysthymia, and cocaine and alcohol abuse.  (R. 430).  She was being treated for depression, alcohol and drug abuse, and PTSD.[11]  (R. 425)  On August 22, 2001, Palmer reported that an unknown person entered her room after bedcheck.  (R. 426).  On August 24, 2001, Palmer asked to see the psychiatrist because she was "anxious, irritable, angry [and] upset." (*Id*.)  The psychiatric assessment revealed that Palmer was suffering from Acute Stress Disorder as well as alcohol and cocaine dependence.  (R. 424).

---

[10] During her in-patient treatment at Hudson Valley, the plaintiff had 26 negative drug tests and only one  positive test for cocaine on November 5, 2000.  (R. 295, 297-301, 303-305, 308, 309).

[11] She had a positive response to the PTSD screen.  (R. 425).

On September 4, 2001, Palmer completed the ADRT program and was transferred to the V.A.'s RTU-T program. (R. 416). Palmer did well in the RTU program until an incident with her roommate on October 27, 2001 in which she threw a garbage can across the room and threatened her roommate. (R. 385-86). On November 19, 2001, Palmer was one year clean and sober. (R. 376). On December 19, 2001, Palmer's GAF score was 40. (R. 364). Her diagnoses remained cocaine and alcohol dependence, depression and posttraumatic stress. (R. 362).

On December 30, 2001, Palmer was involved in another altercation with her roommate in which Palmer threatened her. (R. 360). On December 31, 2001, Palmer was notified that she was being discharged from the dormitory program on January 14, 2002, due to non-compliance with guidelines regarding aggression. (*Id*.)

On January 11, 2002, Palmer's friend called the V.A. to report that Palmer was suicidal as a result of being discharged from the program in 3 days. (R. 359). Palmer presented at the emergency room, very uncooperative and quite intoxicated. (R. 358-59). She was exhibiting rage and anger including homicidal thoughts about her roommate. (R. 323). During this hospitalization, Palmer was diagnosed with Borderline Personality Disorder. (R. 339).

> The patient shows many of the traits associated with Borderline personality including multiple unstable relationships, intense anger and difficulty controlling anger, recurrent suicide behavior, impulsive behavior including substance abuse and she had multiple changes of mood during the interview. . . . [P]atient has a minimum of 5 of the 9 criteria set by the DSM VI for borderline Personality.

(R. 339-40).  Her diagnoses were Borderline Personality Disorder, polysubstance abuse and history of PTSD.  (R. 345)  Her GAF on admission was 35.  (R. 348).  Part of Palmer's diagnostic formulation included the following.

> It is noteworthy that pt has managed to controll (sic) her behavior until a few days pending discharge.  Her current loss of control could be due to fear of abandonment given her BPD. . . .  Pt also has had difficulty managing her affect, and wanting to resort to violence.

(R. 349).  Once admitted, she began moving from paranoid to depressive.  (R. 326).  She remained hospitalized  on the psychiatric ward until January 15, 2002.  (R. 323).

On February 28, 2002, Palmer was admitted to the Tuskegee VA Hospital.  (R. 518). Her diagnoses included post-traumatic stress disorder, cocaine and alcohol dependence, and adjustment disorder.  (*Id*.)  Her medications, upon admission, included Trazodone, Felodipine, Klonopin,[12] and Zoloft.  (R. 519).  Her drug screen was negative.  (R. 520).  On March 20, 2002, Palmer "appears to show PTSD related to rape and sexual abuse marked by nightmares, intrusive thoughts, avoidance, lack of trust of others, hypervigilance, anger, [and] sleep difficulties."  (R. 525).  On April 4, 2002, Palmer reported increased hypervigilance causing her impaired sleep.  (R. 524).

She was discharged from the domiciliary on July 16, 2002, and transferred to a community residence.  (R. 521 & 547).  She continued out-patient therapy.  (R. 521).  On July 26, 2002, it was noted that Palmer "continues to show improvement in sheltered employment."  (R. 547).  On August 2, 2002, Palmer reported "feeling stressed and reacting

---

[12]  Klonopin is used to treat anxiety and panic disorders.

11

with aggravation, but [was] essentially coping."  (R. 546).  On August 22, 2002, Palmer

reported that she could not handle a "rat race" job but rather needed CWT employment.  (R.

541).  Her counselor noted that although she was "affectively stable," her equilibrium was

"somewhat tenuous."  (*Id.*).

### A.  Alcoholism and/or Drug Dependency

The medical expert testified that "[a]lthough she meets 12.09B of the Listing of

Impairments,[13] [Palmer's] drug and alcohol abuse is a material factor contributing to her

disability.  She does not meet a listing in the absence of drug and alcohol abuse."  (R. 26).

Consequently, the ALJ concluded that "[i]f the claimant abstained from alcohol and drugs,

she would not have a combination of impairments meeting or equaling the requirements set

out in the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4."  (R. 27).

In reaching this conclusion, the ALJ opined that "if the claimant abstained from alcohol and

drugs, she would have the residual functional capacity to perform a range of low-stress light

work activity."  (*Id.*)  Consequently, the ALJ concluded that the plaintiff was not disabled.

(*Id.*).

The governing regulations require the Commissioner to first determine whether the

plaintiff is disabled before considering whether her drug addiction or alcoholism is a

contributing factor material to disability.  *See* 20 C.F.R. § 404.1535.  *See also POMS Section

DI* 90070.050B1 ("Follow the general disability case development and evaluation process

---

[13] 12.09B of the Listing of Impairments relates to Substance Addiction Disorders with Depressive syndrome.

. . . to decide whether the individual is disabled.")  Consequently, the ALJ was required to properly complete the five-step sequential analysis before considering the effect of the plaintiff's alcoholism and drug addiction on her disability determination.  *See Doughty v. Apfel*, 245 F.3d 1274, 1279 (11th Cir. 2001); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001).

> The implementing regulations make clear that a finding of disability is a condition precedent to an application of § 423(d)(2)(C).  20 C.F.R. § 416.935(a).  The Commissioner must *first make a determination that the claimant is disabled*.  *Id*.

*Drapeau*, 255 F.3d at 1215 (emphasis added).

> If a claimant is disabled, but has evidence of drug addiction or alcoholism, the ALJ must determine whether the drug addiction or alcoholism is a contributing factor material to the determination of the finding of disability.  20 C.F.R. § 404.1535(a).  *In making this determination, the ALJ considers whether the claimant is disabled without the drug addiction or alcoholism*.  20 C.F.R. 404.1535(b)(1).  The ALJ considers which of the disabling conditions would remain should the claimant stop using drugs or alcohol.  20 C.F.R. § 404.1535(b)(2).  If the ALJ determines that the claimant's remaining limitations would not be disabling, the ALJ will find that the drug usage or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535(b)(2)(i).  Drugs and alcohol are a contributing factor material to the determination of disability when they form the exclusive basis for the finding of disability.  *If there are other grounds for finding the claimant disabled, then drugs and alcohol are not a contributing factor material to the determination of disability*.  20 C.F.R. § 404.1535(b)(2)(ii).

*Englert v. Apfel*, Case No. 97-1526-CIV-ORL-18C, 1999 WL 1289472, at *8, n.3 (M.D. Fla. June 16, 1999) (emphasis added).

### B.  Failure to Consider All of the Plaintiff's Impairments

The court has an obligation to scrutinize the record in its entirety to determine the

reasonableness of the ALJ's decision. *See Walker,* 826 F.2d at 999. The ALJ must consider every impairment alleged by the plaintiff and determine whether the alleged impairments are sufficiently severe - either singularly or in combination - to create a disability. *See Gibson v. Heckler,* 779 F.2d 619, 623 (11th Cir. 1986). All of the plaintiff's impairments must be considered in combination even when the impairments considered separately are not severe. *Hudson v. Heckler,* 755 F.2d 781,785 (11th Cir. 1985). The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review. *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981).

For the reasons that follow, the court concludes that the ALJ erred as a matter of law when he did not properly consider all of the plaintiff's impairments before determining whether the plaintiff was disabled in the absence of her polysubstance abuse. Generally the problem with the ALJ's analysis can be succinctly stated. The ALJ focused only on how Palmer's drug addiction and alcoholism affect her post-traumatic stress disorder symptoms. Consequently, the ALJ improperly interjected Palmer's drug addiction and alcoholism into the sequential disability analysis. Accordingly, the court concludes that because the ALJ failed to properly consider all of the plaintiff's impairments in his initial disability determination, he failed to properly follow the sequential analysis required by the regulations. It follows, therefore, that his determination that the plaintiff's drug and alcohol dependency is a contributing factor material to the disability determination, and that she is not disabled, is not supported by substantial evidence. That said, a more complete explanation is in order.

14

A review of the record demonstrates that the ALJ did not properly consider all of the plaintiff's mental impairments when evaluating her disability claim.  In this case, the ALJ simply ignores Palmer's impairments of Depression (R. 204, 231-32, 286, 292, 328, 362, 479-80, 483, 484, 489), Borderline Personality Disorder (R. 326, 339-40, 346, 399), Anti-social Personality Disorder, (R. 204, 232), Adjustment Disorder (R. 518), and Acute Stress Anxiety (R. 424).  Although the record is replete with references to these mental impairments, the ALJ focuses solely on Palmer's Post Traumatic Stress Disorder and polysubstance dependencies.  The ALJ does not consider whether any of the plaintiff's other mental impairments, individually or in combination, impact her ability to work.

In this circuit, depression can be a non-exertional restriction on an individual's ability to work.  *See Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985) (reversing ALJ's decision for failure to incorporate severe impairments of anxiety and depression into hypothetical to vocational expert).  In *Pendley*, the ALJ did not ask the vocational expert to assume the claimant's anxiety or depression, both of which he found to be severe impairments, in his hypothetical question.  The Eleventh Circuit found that the ALJ's decision was unsupported by substantial evidence and thus, the Commissioner had failed to meet its burden of showing the plaintiff could perform other work in the national economy. The Eleventh Circuit, concluding the "misuse of the expert's testimony alone warrant[ed] reversal,"  remanded the case.  *Id.* at 1563.

In addition, the ALJ ignored evidence that Palmer suffers from Borderline Personality

15

Disorder, Anti-social Personality Disorder, Adjustment Disorder and Acute Stress Anxiety – conditions which cause her to be a danger to others or herself.  The ALJ also ignored evidence demonstrating that Palmer may have limitations from anger and violence would affect her ability to work.  It is clear that the ALJ could not have properly consider the effects of these impairments on Palmer's ability to work, regardless of any substance abuse, because he simply ignored these impairments.

The record contains numerous references to Palmer's difficulties with anger and violence.  For example, on June 12, 2001, Palmer presented to the emergency room at the Milwaukee Veterans Administration Medical Center with complaints that she "[felt] like attacking her uncle and even wished him dead."  (R. 319.)  On January 11, 2002, Palmer presented to the hospital exhibiting "anger and rage that included homicidal thoughts toward her roommate at the dom[iciliary]."  (R. 323.)  A counselor noted that Palmer "has a [history] of intense emotions usually of anger and homocidality toward different people" and "has had difficulty managing her affect, and wanting to resort to violence."  (R. 345-349.)  On September 19, 2002, Dr. Menyhert noted that Palmer "cultivates a fierce and deadly serious persona to survive" and that "she has marked anger problems, although she tries to control her anger by isolation and avoidance."  (R. 535.)  Dr. Menyhert also noted that Palmer "shows paranoid ideation, believing that people, particularly men, are likely to cause her harm."  (R. 534.)  Medical evidence also suggests that Palmer's mental conditions have worsened over time.  "Pt has a [history] of intense emotions usually anger and homocidality

towards different people, worsening since 1995." (R. 345).

Nonetheless, inexplicably the ALJ credited the testimony of the medical expert that "the claimant is not a danger to herself or others." (R. 25). The ALJ does not explain why he fails to credit the medical evidence of these additional impairments nor does he give any reasons for discounting these conditions. The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records, selecting only those portions which support his ultimate conclusion. The ALJ's failure to mention these conditions, let alone articulate reasons for disregarding them, is reversible error. *Broughton v. Heckler,* 776 F.2d 960, 961 (11th Cir. 1985). Because the ALJ ignores medical evidence that suggests Palmer suffers from mental impairments which manifest in anger and violence, the court concludes that the ALJ could not properly consider whether these conditions affect Palmer's ability to perform work, and therefore, the ALJ erred as a matter of law.[14]

### C. Treating Physician's Opinion

The law is well-settled; the opinion of a claimant's treating physician must be accorded substantial weight unless good cause exists for not doing so. *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, *supra*. The ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion. *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987). The ALJ discredits the

---

[14] The court need not consider whether the ALJ's determination that Palmer's drug addiction and alcoholism are contributing factors material to her disability is supported by substantial evidence because the ALJ erred as a matter of law in his initial determination that Palmer was disabled.

plaintiff's treating physician, Dr. Menyhert, as follows:

> Dr. Menyhert and the claimant's allegations that the claimant has been essentially substance free, with the exception of a few one-time use relapses, since October 2000 is not supported by the record. In June 2001, the claimant noted that she was drinking three days a week and had been using cocaine once or twice per week for the past two years. This admission of a two-year history of at least weekly cocaine use is interesting because drug screens from January to April 2001 were negative. As noted above, the claimant provided clean urine specimens for another person. The question is raised whether she received clean urine specimens from others; this would explain her clean drug screens and continued drug use.[15] The claimant's credibility is also called into question by an invalid MMPI in December 2000.[16]
>
> Although Dr. Menyhert concluded that the claimant clearly has post traumatic stress disorder, in December 2000, the VA post traumatic stress disorder program concluded that the claimant did not meet the full criteria of post traumatic stress disorder. In September 2001, she was assessed with only minimal impairments in her ability to socialize, cope, maintain attention, and control her impulses. Contrary to the statement of Dr. Menyhert, the record establishes only intermittent problems with sleep, and these problems occur most often when the claimant is drinking alcohol or taking drugs. For the above reasons, Dr. Menyhert's opinions are entitled to little probative weight.

(R. 25) (footnote added).

    A review of the medical records clearly demonstrates that the ALJ culled the record for selective references, ignoring comments that did not support his conclusions. On

---

[15] Clearly, the ALJ's conclusion that Palmer's substance abuse was not in remission from January 2001 to April 2001 is speculative at best. (R. 25.) The medical evidence contains 26 negative drug tests. (R. 295, 297-301, 303-305, 308.) There is only one positive test for cocaine on November 5, 2000. (R. 309). The ALJ's determination does not properly reconcile the evidence demonstrating that Palmer had negative drug test results yet continued to exhibit symptoms of post-traumatic stress disorder. His attempt to reconcile Palmer's negative test drugs with his conclusion that she had relapsed appears to be convoluted, illogical and not based on substantial evidence.

[16] The medical records before this court do not include an MMPI report. An ALJ has a duty to develop a full and fair record. *Kelley v. Heckler*, 761 F.2d 1538 (11th Cir. 1985). Because the court does not have the MMPI, this court cannot determine whether this credibility determination was based on substantial evidence.

September 20, 2002, Palmer's treating psychologist, Dr. Menyhert submitted a lengthy treatment record in which she indicates that Palmer "has been completely alcohol and drug free, with testing to document this, since [February 2002.]" (R. 534).  In addition, Dr. Menyhert concluded that Palmer

> clearly meets the criteria for PTSD.  She experienced several serious traumas involving injury and threat to the physical integrity of herself and others, reacting with fear and distress.  These include her sexual abuse by her father, witnessing the severe beatings and physical abuse of her mother by her father that led to her mother's death and her rape in the military.
> . . .
> Pt. has a clear history of substance abuse.  Substance abuse is very common with PTSD as it is a way to achieve the psychic numbing that is essential in the face of severe traumas. . . . Pt. stopped her persistent abuse of cocaine and alcohol when she began her first treatment program . . . but she had a few one-use relapses between 10-00 and 2-02.  She has been drug and alcohol free for 7 months, with random testing to substantiate this.  Although she has been substance freee, her PTSD symptoms continue. . . . In fact, some of them may be more server, particularly the reliving of traumatic experiences, without the numbing effects of drugs and alcohol.

(R. 534-35).  Contrary to the ALJ's recitation, Dr. Menyhert did not report that Palmer had been drug-free since October 2000; she concluded that "at the present time her symptoms of PTSD are causing significant disability primarily in her interpersonal relationships, including work relationships, and her emotional control."  (R. 535).  Dr. Menyhert diagnosed Palmer with Posttraumatic Stress Disorder and Alcohol and Cocaine Abuse, Early Sustained Remission.  (*Id.*)

Dr. Menyhert also completed a medical assessment form in which she concluded that Palmer's ability to relate to others, interact with the public and handle work stressors was

poor to none.  (R. 528-531).

> Pt. has the ability to perform in these areas for a limited amount of time.  Her diagnosis of PTSD makes her very vulnerable to stress, even at normal levels. When stressed or feeling threatened, pt. is likely to show angry outbursts, poor judgment or severe withdrawals.
>
> . . .
>
> [H]er PTSD symptoms of heightened anxiety and anger are likely to significantly compromise her ability to comprehend and remember instructions.
>
>  . . .
>
> Pt.'s diagnosis of PTSD and traumas involving males make it very difficult for her to work with males she perceives as authoritarian, dominating, or in any way threatening.  Pt.'s continues to show emotional instability, angry outbursts and alienation from others making it difficult for her to adjust to the workplace.
>
> . . .
>
> Pt. has been able to function fairly well in a sheltered work setting of CWT at CAUHCS.  She would have marked difficulties as described above in a competitive work setting.  These opinions are based on history, MSE and observations over 23 therapy sessions over 6 months.

(R. 529-530).

While the ALJ is entitled to make credibility determinations, the ALJ may not substitute his judgment for the judgments of experts in their field of expertise.  Psychologists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment.  The ALJ discounted Dr. Menyhert's opinions because her opinion was contrary to an earlier medical assessment.  However, the medical records submitted by the plaintiff clearly demonstrate that Dr. Menyhert was Palmer's treating psychiatrist while there is no evidence as to who completed the earlier assessment or when that assessment was completed, i.e. during in-take or after treatment.  In rejecting Dr.

Menyhert's opinions, the ALJ improperly substituted his judgment and interpretation of the

plaintiff's mental condition for that of Palmer's treating psychologist. *See generally*

*Marbury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1992). Thus, the court concludes that the

ALJ's decision to reject or ignore all of Dr. Menyhert's opinions is not supported by

substantial evidence.

### D. Improper Reliance on Medical Expert

The ALJ relied instead on the testimony of Dr. Nancy Sack, the medical expert, to

conclude that Palmer has "no barriers to employment except for drugs and alcohol abuse."

(R. 25).

> Dr. Sack provided the following testimony. Treatment records show the
> claimant is not a danger to self or others. She does not have barriers to
> employment except drugs and alcohol abuse. CWT (comprehensive work
> therapy program) records show above average ability to work. She is in
> control of her anger. . . . A GAF of 60 is consistent with mild to moderate
> symptoms. The claimant would need a low social environment job. This
> testimony is consistent with the substantial evidence of record and, therefore,
> entitled to great probative weight.

(R. 25-26). The problem with the ALJ's analysis is again his selective recitation of the

testimony from the administrative hearing. Although the ALJ points to Dr. Sack's testimony

regarding the plaintiff's work in a comprehensive work therapy program, he ignores the

vocational expert's testimony that Palmer's ability to work well in the comprehensive work

therapy program does not translate into an ability to work in a competitive work setting.

> Q.   Mr. Martin, are you familiar with compensated work therapy that the
>      VA runs?
> A.   Yes I'm familiar with those type programs.

21

Q.     And is that the type of program, in your estimation, that has very little stress associated with it?

A.     Yes.

Q.     And would that, an indication of being able to work in that environment be an indication of being able to work in a competitive and sustained routine environment in the outside?

A:     It's not comparable to that, no.

(R. 602).

When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion over another. "Conflicts in the evidence, including medical opinions, are to be resolved by the [Commissioner], not by the courts." *Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981) *citing Laffoon v. Califano*, 558 F.2d 253, 254-55 (5th Cir. 1977). *See also Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981) ("[T]he ALJ has primary responsibility for responsibility for resolving conflicts in the evidence."). An ALJ may not arbitrarily pick and choose facts from the medical evidence to support his conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury*, 957 F.2d at 840-841. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart*, 662 F.2d at 735. "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson*, 755 F.2d at 785. In order to fulfill his obligations, the ALJ must, at the very least, resolve the inconsistencies in the testimony, rather than selectively choosing

items to support his decision.  The ALJ failed to resolve the inconsistencies regarding the plaintiff's ability to work in a competitive work environment versus her ability to perform work in a sheltered work setting.

### E.  GAF Scores

The Global Assessment Functioning Scale considers the psychological, social, and occupational functioning of an individual suffering from mental illness.  A score of between 41 and 50 indicates serious symptoms or any serious impairments in social, occupational, or school functioning.  *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994).  A rating of 31-40 indicates "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Haag v. Barnhart*, 333 F.Supp.2d 1210, 1214 (N.D. Ala. 2004) (*quoting* DSM-IV-TR at 34).  A GAF of 35 is strong evidence of an inability to work.  *Haag*, *supra* (*citing Lloyd v. Barnhart*, 7 F.Appx. 135, 2002 WL 31111988 at *1, n. 2 (3rd Cir. 2002)).

The ALJ concluded that Palmer could perform her past relevant work and that substance abuse was a material factor contributing to Palmer's disability because "in December 2000, [Palmer] was noted as being employable with a GAF of 48, . . . the most recent diagnosis was in July 2002 when she was given a GAF of 60 with no restrictions on her activities."  (R. 26).  The problem with the ALJ's reliance on Palmer's scores is particularly disturbing in light of the Commissioner's position regarding GAF scores,

23

coupled with his failure to reconcile inconsistencies and conflicts in the evidence regarding her GAF scores. Consequently, the court cannot determine whether the ALJ's decision is based on substantial evidence.

The Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." *See* 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000). Perhaps more importantly, however, the ALJ failed to consider the effects of the plaintiff's in-patient treatment in sheltered environments on her GAF scores. The ALJ selected two arbitrary GAF scores to conclude that Palmer is now able to function in a work environment. There are numerous other references to GAF scores in the record which the ALJ does not consider. For example, on September 23, 2000, Palmer was admitted to the Veterans Administration Medical Center in Atlanta, Georgia, with a diagnosis of post-traumatic stress disorder and a GAF score of 35. (R. 127-129.) She was discharged on October 3, 2000, with a GAF score of 60. (R. 127)

Palmer was then hospitalized at the Veterans Administration Medical Center in Hudson Valley, New York, from October 31, 2000, until December 7, 2000. (R. 130-197). Although Palmer was rated as employable, she was given a GAF score of 48 upon discharge from the Center. (R. 130-131). On December 19, 2000, she was given a GAF rating of 50. (R. 211.) However, on January 10, 2001, she was discharged from the Brecksville Veterans Administration Medical Center with a GAF score of 45. (R. 204-05.) Two days later,

Palmer was screened for the psychosocial rehabilitation program at Hudson Valley Health Care. (R. 292-94) She was accepted into the program and began receiving treatment for her conditions on January 23, 2001. (R. 245-294) Palmer received a GAF score of 50 on February 27, 2001. (R. 259)

On June 12, 2001, Palmer entered the Veterans Administration Medical Center in Milwaukee, Wisconsin for in-patient treatment of her dysthymia and alcohol and cocaine abuse with a GAF rating of 30. (R. 319) She was discharged from the in-patient program on June 14, 2001, with a GAF rating of 45. (*Id.*) After two months of treatment, on or around September of 2001, she received a GAF score of 40. (R. 397-399.) In December 2001, Palmer again received a GAF score of 40. (R. 364.)

Palmer also received treatment at the Veterans Administration Medical Center in Tuskegee, Alabama from February 28, 2002, until July 16, 2002. (R. 518) During this time, she participated in sheltered employment and domiciliary programs. (R. 521) Upon discharge, she received a GAF rating of 60. (R. 518) However, during an out-patient therapy session on September 19, 2002, Palmer received a GAF rating of 55.[17] (R. 536)

The ALJ's conclusion that the plaintiff is employable because her GAF score is 60 and that score is "consistent with mild to moderate symptoms," is simply not supported by substantial evidence. Because there are vast differences in Palmer's GAF scores which

---

[17] Although Palmer's treatment was on an out-patient basis, the record indicates that she was participating in the work program and protected housing at the Tuskegee Veterans Administration Center at the time of testing. (R. 535.)

appear to correlate to with her admissions and discharges from sheltered environments or treatment centers, the ALJ had an obligation to reconcile the inconsistencies between the GAF scores.  Without reconciling the inconsistencies in the evidence regarding Palmer's GAF scores, the ALJ's reliance on one GAF score is not supported by substantial evidence.

### V.  Conclusion

Accordingly, for the reasons as stated, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 23rd day of December, 2005.


_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE